IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ROSE PALMER, AS ADMINISTRATRIX OF THE ESTATE OF EVERETT PALMER, JR., DECEASED | : : : : | |
| Plaintiff, | : : | |
| v. | : | |
| YORK COUNTY, PENNSYLVANIA | : : | Civil Action No. 1:20-cv-00539 |
| AND | : : | |
| YORK COUNTY PRISON BOARD | : : | JURY TRIAL DEMANDED |
| AND | : : | |
| CORRECTIONS OFFICER ERIC EMIG | : : | |
| AND | : : | |
| CORRECTIONS OFFICER NICHOLAS CESSNA | : : | |
| AND | : : | |
| CORRECTIONS OFFICER DONALD KOPP | : : | |
| AND | : : | |
| CORRECTIONS OFFICER TIMOTHY IRIZARRY | : : : | |
| AND | : : | |
| CORRECTIONS OFFICER GREGGORY CLARK | : : | |
| AND | : : | |
| CORRECTIONS OFFICER WILLIAM LYBRAND | : : | |
| AND | : : | |
| CORRECTIONS OFFICER TYLER LARKIN | : | |

|                                          |    |
| ---------------------------------------- | -: |
|                                          | :  |
| AND                                      | :  |
|                                          | :  |
| CORRECTIONS OFFICER MAX FINK             | :  |
|                                          | :  |
| AND                                      | :  |
|                                          | :  |
| CORRECTIONS OFFICER WAYNE SMITH          | :  |
|                                          | :  |
| AND                                      | :  |
|                                          | :  |
| CORRECTIONS OFFICER TED KONASOL          | :  |
|                                          | :  |
| AND                                      | :  |
|                                          | :  |
| CORRECTIONS OFFICER BRANDON SCHNEIDER    | :  |
|                                          | :  |
| AND                                      | :  |
|                                          | :  |
| CORRECTIONS OFFICER NATHAN FITSKEE       | :  |
|                                          | :  |
| AND                                      | :  |
|                                          | :  |
| CORRECTIONS OFFICER STEVEN BOLDING       | :  |
|                                          | :  |
| AND                                      | :  |
|                                          | :  |
| CORRECTIONS OFFICER RONALD BELT          | :  |
|                                          | :  |
| AND                                      | :  |
|                                          | :  |
| JOHN DOE OFFICERS 1-5                    | :  |
|                                          | :  |
| AND                                      | :  |
|                                          | :  |
| NURSE DAVID ZINN                         | :  |
|                                          | :  |
| AND                                      | :  |
|                                          | :  |
| CATHERINE STEUFFER                       | :  |
|                                          | :  |

AND

JOANNE WEBSTER

AND

DIANNA KNIGHT

AND

NURSE JOSHUA PAULEY

AND

BRYCE LEFEVER

AND

JOHN DOE PRIMECARE EMPLOYEE

AND

PRIME CARE MEDICAL, INC.

AND

AXON ENTERPRISE, INC.

AND

JOHN DOE CORPORATIONS 1-2

**Defendants.**

## <u>FIRST AMENDED CIVIL ACTION COMPLAINT</u>

**NOW COMES** Rose Palmer as duly appointed administrator of the Estate of Everett Palmer,

Jr., deceased, by and through chosen counsel Daniel Purtell, Esquire and John J. Coyle, Esquire of

McEldrew Young Purtell and S. Lee Merritt of Merritt Law Office, complaining of the conduct of

the named defendants, and in support thereof states the following:

## NATURE OF THE ACTION

1.     On April 7, 2018, Everett Palmer Jr. travelled from his residence in Delaware to York County, Pennsylvania to resolve an open warrant related to an old DUI charge.  The personal trainer and U.S. Army veteran arrived in York County sober, healthy and in good spirits. Mr. Palmer was booked and taken to York County Jail where he was placed in a solitary confinement.  Two days later, Everett Palmer Jr. was dead.  His body was covered in bruises. His blood was filled with methamphetamine.

## PARTIES

2.     Plaintiff, Rose Palmer, is an adult individual, the mother of Everett Palmer, Jr., and the administratrix of his Estate.

3.     Plaintiff, Rose Palmer, has been designated as Administratrix of the Estate of Everett Palmer, Jr., deceased, by the remaining parent and natural guardian of Everett Palmer's two surviving minor children, M.E.B. and M.D.B.

4.     Defendants Eric Emig, Nicholas Cessna, Donald Kopp, Timothy Irizarry, Greggory Clark, William Lybrand, Tyler Larkin, Max Fink, Wayne Smith, Ted Konasol, Brandon Schneider, Nathan Fitzkee, Steven Bolding, Ronald Belt, and John Doe Officers 1-5  were at all times relevant herein acting under color of state law in the scope and course of their duties as prison guards with the York County Prison.  These defendants are being sued in their individual capacity.

5.     Defendant York County is a county organized pursuant to the laws of the Commonwealth of Pennsylvania.  York County owns and operated the York County Prison, and along with Defendant York County Prison Board and Defendant Warden Clair Doll is responsible for

the implementation of the prison's budget, personnel, staffing, training, policies, procedures, practices, and customs.   York County may be served at the Office of the York County Administrator, 28 E. Market Street, York, PA 17401.

6. Defendant York County Prison Board operated York County Prison on behalf of York County pursuant to state law.  York County Prison Board may be served at the Office of the York County Administrator, 28 E. Market Street York, PA 17401.

7. Defendants David Zinn, Catherine Steuffer, Joanne Webster, Diana Knight, Joshua Pauley, Katherine Shield, Dr. Bryce Lefever, and John Doe Prime Care Employees 1-2 are employees of Prime Care who provide medical services within York County Prison.

8. Prime Care Medical, Inc. is a corporation with its principle place of business located at 3940 Locust Lane Harrisburg, PA 17109.

9. Defendant Axon Enterprise, Inc. is a corporation engaged in the business of the manufacture and distribution of electronic control weapons, specifically the TASER X26, used by officers at York County Prison.  Defendant Axon is incorporated under the laws of the State of Delaware and maintains a principle place of business at 17800 N. 85th St. Scottsdale, AZ 85255.

10. Defendant John Doe Corporation 1 is a corporation engaged in the manufacture and sale of spit hoods supplied to and used within York County Prison.

11. Defendant John Doe Corporation 2 is a corporation engaged in the manufacture and sale of emergency restraint chairs supplied to and used within York County Prison.

12. Defendant Claire Doll is the Warden of the York County Prison.  He may be served at the Office of the York County Administrator, 28 E. Market Street York, PA 17401.

## JURISDICTION AND VENUE

13.    Jurisdiction and Venue are proper in this Honorable Court as Defendants' constitutional violations, intentional torts, and otherwise violative conduct occurred in York County, Pennsylvania.

## FACTS RELATED TO
## THE UNLAWFUL KILLING OF EVERETT PALMER, JR.

14.    Everett Palmer Jr. was a 41-year-old father of two.

15.    The former U.S. Army paratrooper was in good health and worked as a personal trainer in Seaford, Delaware.

16.    On April 7, 2018, Everett traveled to York County, Pennsylvania to voluntarily address an old warrant for a DUI charge.

17.    Everett had recently become aware of the charge and wanted to resolve it while on his way to New York to visit his family.

18.    Everett drove himself to York County.

19.    Upon arrival, Everett was sober and in good spirits.

20.    He was taken into custody and brought before Magisterial District Judge Scott J. Gross at approximately 8:25PM.

21.    Despite Mr. Palmer voluntarily turning himself in to resolve this old DUI charge, Judge Gross ordered Mr. Palmer held on $5,000 bail.

22.    Because he did not have enough money on his person to pay the bail, Everett Palmer was remanded to the custody of the York County Prison.

23.    At approximately 9:45 PM, Palmer was brought to intake processing at York County Jail.

24.   At processing, Palmer appeared calm, remained unrestrained, and chatted calmly with the Sheriff's officers who brought him to jail.

25.   After processing, Palmer was determined to be a suicide risk, in part due to a reported treatment with the Veteran's Administration for bipolar disorder.

26.   Palmer was also observed to be non-responsive and mumbling to himself.

27.   As a result of this determination, Palmer isolated in a cell by himself without direct contact with any other inmates.  Additionally, Palmer was put on a 24/7 watch.

28.   Later that evening, Everett Palmer began to descend into a mental breakdown.  This is first evidenced by conversations between Palmer and John Doe Officers 1-2 in which Palmer relayed hallucinating the presence of two individuals outside his window.

29.   Despite being present for the purpose of observing Palmer's mental state, John Doe Officers 1-2 did not report Palmer's hallucinations to any medical provider.

30.   Rather, on the York County Prison SMU Check Sheet, John Doe Officers 1-2 record Palmer's mental state as "Quiet/Seclusive", further obfuscating the true nature of Palmer's mental condition from treating providers.

31.   Palmer's mental health further destabilized as the night progresses.  Between the hours of 1:20 AM and through 2:45AM on the morning of April 8, banging and howling from other cells led Palmer to enter an agitated state.

32.   During this period, Palmer began screaming and howling at the prison guards.

33.   Eventually, Palmer mental break down became so severe that he stripped naked and rubbed urine on himself while screaming out the door at the guards assigned to observe him.

34.     Palmer ripped his mattress off his bed and stood on the platform screaming at the officers.

35.     In response, John Does 3-4 joked "He's not that big" and otherwise ignored the deteriorated mental state of Palmer.

36.     Additionally, John Does 3-4 disregarded Palmer's severe mental breakdown and never reported it to any medical provider.

37.     John Does 3-4 diminished the event and failed to provide proper medical care when they recorded Palmer's behavior between 1:15AM and 2:45 AM on the York County Prison SMU Check Sheet as "Self-Contained Activity" or "Quiet/Seclusive."

38.     Additionally, at 2:59 AM, surveillance video demonstrates Defendant Dianna Knight arrived at Palmer's cell for her scheduled wellness check.

39.     Surveillance video depicts Defendant Knight conversing with the officers, however the officers failed to inform Defendant Knight of Mr. Palmer's severe and potentially self-harming behavior.

40.     Defendant Knight spent 24 seconds at the cell door of Everett Palmer completing her wellness check.

41.     Of those 24 seconds, Defendant Knight looked through the window into Mr. Palmer's cell for 8 seconds.  The remainder of the time she was facing and speaking to the guards.

42.     Defendant Knight entered the results of her visit in the medical chart as "Wellness checks done, inmate lying on bunk, respirations observe [sic], no complaints voiced."

43.     However, identically timestamped surveillance video from inside Palmer's cell shows a much different picture.  Palmer is face down, naked, and unconscious, lying on the floor of his cell.  His mattress is ripped off the bunk and laying by the door.

44.   Information regarding Palmer's mental breakdown was never communicated to the mental health specialist tasked with evaluating Palmer, Dr. Bryce Lefever.

45.   Dr. Lefever saw Mr. Palmer at 6:08AM on April 8, 2018.  Dr. Lefever noted evidence of thought disorder or perceptual disturbance and determined that Mr. Palmer was unstable.

46.   Dr. Lefever assessed psychosis in Mr. Palmer.  Nonetheless, Mr. Palmer was not referred out to a mental health facility but was rather returned to his cell.

47.   At 1:15 PM on April 8, Defendant Schneider approached Mr. Palmer's cell and handed him a bag believed to contain illicit narcotics, specifically methamphetamine.

48.   This transfer of materials believed to be methamphetamine was captured by surveillance video from the corridor.

49.   This transfer occurred directly in front of Defendants Fitskee, Bolding, Belt, and/or John Doe Officer 5.

50.   None of the officers took any steps to stop the transfer.

51.   Additionally, despite knowledge of Mr. Palmer's serious mental health issues, none of Defendants Schneider, Fitzkee, Bolding, Belt, or John Doe 5 informed a medical provider of the provision of illicit and destabilizing drugs.

52.   At approximately, 5:15 PM and again at 8:00PM, John Doe Prime Care Employee with the assistance of a yet unidentified officer provided an unknown substance to Mr. Palmer.

53.   The provision of this substance was not noted in the medical chart produced prior to the filing of this Amended Complaint.

54.   Later that same evening, Palmer became agitated and his mental stability deteriorated.

55. Upon information and belief, this occurred in part due to the consumption of the methamphetamine provided by Defendant Schneider coupled with the consumption of the unknown substance provided by John Doe Prime Care Employee.

56. Around 2:00AM on April 9, Mr. Palmer's mental status began to rapidly and severely deteriorate.

57. He demonstrated outward signs of being in an acute mental health episode as early as 2:06 AM when he tore his mattress and blanket off the bed and began searching the toilet bowl for something.

58. By 2:45 AM, Everett was screaming at hallucinations on the ceiling and put his mattress over the door.

59. By 2:50 AM, Everett was attempting to throw his blanket over the surveillance camera in his cell.

60. By 2:58 AM, Everett was in a full psychotic break, yelling incoherently and climbing on top of the sink in his cell.

61. Despite these outward signs that Mr. Palmer was in need of immediate medical assistance, Defendant Emig and Defendant Cessna failed to notify medical of Mr. Palmer's behavior.

62. Instead, Emig and Cessna wrote Mr. Palmer an infraction for placing his mattress over his cell door.

63. By 3:11 AM, Palmer had stripped naked and was incoherently screaming.

64. Throughout this time, medical services were never called and Mr. Palmer's condition was recorded as either "Quiet/Seclusive" or "Self-Contained Activity" on the SMU Check Sheet.

65. At 3:30 AM, Defendant Zinn came to Mr. Palmer's cell to do the scheduled wellness check.

66. No corrections officer informed Defendant Zinn of Mr. Palmer's deteriorating mental health.

67. Defendant Zinn remained at Mr. Palmer's door for 11 seconds before walking away.

68. Defendant Zinn recorded in the medical chart "Patient seen at cell door for wellness check. Patient kneeling behind cell door. Patient refused to respond to medical staff, patient rambling, incoherent. Basic needs provided for."

69. Contemporaneous surveillance footage from inside the cell indicates that Mr. Palmer was naked and speaking to himself incoherently.

70. Defendant Zinn did nothing to address Mr. Palmer's need.

71. Defendant Zinn neither referred Mr. Palmer to outside medical care or alerted the jail psychologist.

72. For the next 25 minutes, Mr. Palmer continued to scream and yell incomprehensibly, crawl and run around his cell naked, and try to remove his sink and toilet from the wall while Defendants watched but took no action.

73. Mr. Palmer continued to spiral further and further into psychosis while working himself into a sweat.

74. Mr. Palmer began injuring himself, slamming his fist, feet, and eventually his head into the cell door.

75. Medical personnel were never called to sedate or otherwise treat Mr. Palmer.

76. Instead, the prison's tactical unit, the CERT team was called to respond.

77.   The prison CERT team consisting of Defendants Eric Emig, Nicholas Cessna, Donald Kopp, Timothy Irizarry, Greggory Clark, William Lybrand, Tyler Larkin, Max Fink, Wayne Smith, and Ted Konasol gathered at Mr. Palmer's door.

78.   Everett was advised to lay on the ground and put his hands behind his back, and he did so for a brief period.

79.   However, the CERT team did not enter the cell to handcuff him.

80.   At approximately 4:17 AM, the door was opened and Defendant Cessna deployed a TASER at Mr. Palmer despite the fact that Mr. Palmer was standing near the door with his hands clasped in front of him to be cuffed.

81.   Mr. Palmer recoiled to the back of the room after being struck by the TASER.

82.   At that point, Defendant Clark led a charge at Mr. Palmer, jumping on top of him with a tactical shield.

83.   At least six other defendants including Defendants Emig, Cessna, Kopp, Irizarry, Clark, Lybrand, Larkin, Fink, Smith, and/or Konasol followed into the cell piling on top of, striking, kicking, and standing on Mr. Palmer.

84.   Defendant Cessna deployed his TASER on Mr. Palmer at least two more times.

85.   Defendant Kopp deployed his TASER on Mr. Palmer as well.

86.   Palmer lay at the bottom of the pile of officers for 3 minute and 7 seconds.

87.   At some point, a spit hood was placed over Mr. Palmer's face severely restricting his ability to breathe.

88.   Palmer was then carried out of the cell with his arms and legs shackled.

89.   Palmer was placed in an Emergency Restraint Chair and held with his arms over his head.

90.  As the CERT officers worked on the shackles and restrained Palmer's arms over his head, Palmer obviously struggled for oxygen.

91.  Everett's chest was heaving and his face turned blue, an obvious symptom of oxygen deprivation.

92.  Everett stopped breathing and went unconscious in the Emergency Restraint Chair.

93.  Despite the fact that Palmer's chest had stopped moving, his face was blue, he ceased moving, and he appeared unconscious, the CERT team failed to remove the spit hood and restraint chair even as they transported him to medical.

94.  Upon arriving at medical Defendants Zinn, Steuffer, Webster, and Knight met with Mr. Palmer.

95.  Mr. Palmer showed no signs of breathing and had little to no pulse upon arrival in the medical unit.

96.  Nevertheless, the CERT team Defendants and the Prime Care Defendants failed to remove the spit hood and restrain chair.

97.  Mr. Palmer remained in the spit hood and restraint chair for 8 minutes and 13 seconds after he stopped breathing.

98.  Everett Palmer, Jr. was declared dead at a local hospital later that morning, a result of asphyxiation.

99.  Post-mortem analysis indicated that his blood contained an extremely high level of methamphetamine and amphetamine in his system.

100.    Specifically, at the time of the blood draw following his death, Everett had blood toxicology levels of 625 ng/mL of methamphetamine and 130 ng/mL of amphetamine.  There was no alcohol in Everett's system.

101.    Based upon the level of methamphetamine in Everett's blood at death, the half-life of methamphetamine, and the time Everett was in custody, it is impossible for Everett to have consumed all of the methamphetamine prior to turning himself in to York County Authorities.

102.    Upon information and belief, the methamphetamine in Everett's since came from the previously described hand to hand drug transfer.

103.    An autopsy was performed on Everett by Dr. Rameen Starling-Roney of the York County Coroner's Office.

104.    The autopsy report produced by the County noted that Palmer had significant bruising and lacerations all over his body, including:

- Two puncture defects on the right forearm

- 3" x 1.25" contusion on the right hand

- 6.25" x. 5" contusion on the right forearm, elbow, and arm

- 5" x 4" contusion with abrasions on the left elbow, forearm, and arm

- 6" x 2.5" contusion on the right lower leg

- 4" x .75" abrasion on the left lower leg

- 1" abrasion on the frontal scalp

- 1.25" abrasion on the mid-parietal scalp

- Two 1.25" - 1.5" abrasions on the left temporal scalp

- .5" abrasion on the right side of the upper chest

- .25" x .125" abrasion of the left torso

- .1875" x .125" abrasion of the left hip

- Hemorrhage/blood extravasation along the soft tissue in both elbows

105.  Despite numerous requests, Plaintiff has not been provided the available photographs in support of the above described injuries.

106.  Contrary to the National Association of Medical Examiners position paper on Deaths in Custody, Dr. Starling-Roney refused to conclude Everett's death was a homicide and instead ruled the cause of death as "undetermined."

107.  However, the findings detailed in the autopsy included microscopic changes consistent with hypoxic ischemia and lead to the unambiguous medical conclusion that Everett died from asphyxiation.

108.  This asphyxiation was likely caused by physical abuse, restraint, and the application of a spit-hood.

109.  Following the autopsy, Everett's body was released to his family so that a private second autopsy could be performed.

110.  At that time, Everett's heart, brain, throat and hyoid bone had been removed from his body and were not produced to the family.

111.  While the autopsy report prepared by Dr. Starling-Roney indicates that the brain and heart were retained for further examination, the report makes no note of the removal or retention of Everett's throat and hyoid bone.

112.    In fact, the report makes no mention of any injuries to the throat to warrant additional examination.

113.    When asked about the location of the throat, the York County Coroner originally indicated it had been turned over to the funeral home for family.

114.    That remained the Coroner's official position for nearly two weeks until the Office changed course and claimed that the throat had been retained along with the other organs and sent to a private laboratory where it was being held.

115.    Requests to retrieve the organs for DNA testing and pathological evaluation have been refused.

## WRONGFUL DEATH ACTION

116.    Plaintiff, Rose Palmer, as appointed by the parent and natural guardian of the minor children of Everett Palmer, Jr., hereby brings Wrongful Death claims pursuant to 42 Pa.C.S. §8301 (the Pennsylvania Wrongful Death Statute) and Pa.R.C.P. 2202(a), on behalf of all those persons entitled by law to recover damages as a result of the wrongful death of Everett Palmer, Jr.

117.    The names and address of all persons legally entitled to recover due to the wrongful death of Everett Palmer is Mychele Boykin, as property guardian and p/n/g of M.E.B. and M.D.B.

118.    No other action has been brought to recover for Mr. Palmer's death under the aforementioned statute(s).

119.    Plaintiff claims all available damages under the Pennsylvania Wrongful Death Statute for financial contributions and the loss of future services, support, society, comfort, affection, guidance, tutelage, and contribution that the Plaintiff's decedent, Everett Palmer, Jr., would

have rendered to the wrongful death beneficiaries but for his traumatic, untimely and unnatural death.

120.   Plaintiff claims damages for payment for all medical bills and/or expenses.

121.   Plaintiff claims damages for payment of funeral and burial expenses.

## SURVIVAL ACTION

122.   Plaintiff also brings a Survival Action under the Pennsylvania Survival Statute, 42 Pa.C.S. § 8302, and pursuant to 20 Pa.C.S. § 3373, for all damages recoverable under the Statute, including but not limited to, loss of income both past and future income potential, as well as, pain and suffering prior to death, and for emotional distress suffered by Plaintiff's decedent, Everett Palmer, Jr., from the initiation of the assault upon him until the ultimate time of his death.

## COUNT I: VIOLATION OF THE FOURTEENTH AMENDMENT – EXCESSIVE FORCE ON A PRETRIAL DETAINEE
*Plaintiff v. Eric Emig, Nicholas Cessna, Donald Kopp, Timothy Irizarry, Gregory Clark, William Lybrand, Tyler Larkin, Max Fink, Wayne Smith, and Ted Konasol*

123.   The preceding paragraphs are incorporated by reference as though laid out fully herein.

124.   Defendants Emig, Cessna, Kopp, Irizarry, Clark, Lybrand, Larkin, Fink, Smith, and Konasol crushed Everett Palmer, beat him, choked him, tased him, restrained him and failed to obtain necessary and timely medical care all contributing to and causing his untimely and unnatural death.

125.   The actions of Defendants Emig, Cessna, Kopp, Irizarry, Clark, Lybrand, Larkin, Fink, Smith, and Konasol were intentional, objectively unreasonable and were not rationally related to any legitimate non-punitive governmental purpose.

126.    As a result of the actions of Defendants Emig, Cessna, Kopp, Irizarry, Clark, Lybrand, Larkin, Fink, Smith, and Konasol, Everett Palmer suffered mental anguish, extreme pain, agony and ultimately death.

127.    Plaintiff seeks survival damages, as stated above, including for the nature and extent of Decedent's injuries, pre-death pain and suffering, emotional distress, and loss of life and enjoyment of life, as well as all available wrongful death damages available under the law.

**WHEREFORE**, Plaintiff demands judgment in her favor, and against Defendants pursuant to 42 U.S.C. § 1983, in an amount in excess of One Million Dollars ($1,000,000.00), including interest, delay damages, costs of suit, general and specific damages, including both survival and wrongful death damages, punitive and exemplary damages as provided by law, attorneys' fees under U.S.C. 1985 and 1988, and any other remedies legally appropriate.

### COUNT II: ASSAULT AND BATTERY
*Plaintiff v. Eric Emig, Nicholas Cessna, Donald Kopp, Timothy Irizarry, Gregory Clark, William Lybrand, Tyler Larkin, Max Fink, Wayne Smith, and Ted Konasol*

128.    The preceding paragraphs are incorporated by reference as though laid out fully herein.

129.    Defendants Emig, Cessna, Kopp, Irizarry, Clark, Lybrand, Larkin, Fink, Smith, and Konasol crushed Everett Palmer, choked him, tased him, restrained him, and failed to obtain necessary and timely medical care all contributing to and causing his untimely and unnatural death.

130.    The actions of Defendants Emig, Cessna, Kopp, Irizarry, Clark, Lybrand, Larkin, Fink, Smith, and Konasol were intentional, objectively unreasonable and constituted willful misconduct, a crime, and actual malice.

131.    As a result of the actions of Defendants Emig, Cessna, Kopp, Irizarry, Clark, Lybrand, Larkin, Fink, Smith, and Konasol, Everett Palmer suffered mental anguish, extreme pain, agony and ultimately death.

132.    Plaintiff seeks survival damages, as stated above, including for the nature and extent of Decedent's injuries, pre-death pain and suffering, emotional distress, and loss of life and enjoyment of life, as well as all available wrongful death damages available under the law.

**WHEREFORE**, Plaintiff demands judgment in her favor, and against Defendants pursuant to state law, in an amount in excess of One Million Dollars ($1,000,000.00), including interest, delay damages, costs of suit, general and specific damages, including both survival and wrongful death damages, punitive and exemplary damages as provided by law, and any other remedies legally appropriate.

### COUNT III: VIOLATION OF THE FOURTEENTH AMENDMENT – DELIBERATE INDIFFERENCE TO A SERIOUS MEDICAL NEED
#### Provision of Methamphetamine and Failure to Intervene
*Plaintiff v. Defendants Schneider, Fitskee, Bolding, Belt, John Doe Officer 5,  John Doe Prime Care Employee, and Prime Care Medical, Inc.*

133.    The preceding paragraphs are incorporated by reference as though laid out fully herein.

134.    Defendants Schneider, Fitskee, Bolding, Belt, John Doe Officer 5, and John Doe Prime Care Employee were aware of Everett Palmer's severe mental distress.

135.    Nonetheless, Defendant Schneider provided Palmer with methamphetamine, a drug with severe psychotic and mentally destabilizing effects.

136.    Defendant John Doe Prime Care Employee also provided Palmer with unknown substances at two separate intervals immediately preceding his loss of mental acuity and death.

137.   Defendants Fitskee, Bolding, Belt, and/or John Doe Officer 5 observed Defendant Schneider provide the methamphetamine to Palmer, but took no actions to stop him, report him, or otherwise rectify the dangerous and deadly actions of Defendant Schneider.

138.   It is known to every reasonable individual that an individual on suicide watch and suffering from severe mental health issues would be in immediate need of medical treatment if the individual ingested methamphetamine.

139.   Nonetheless, Defendants Schneider, Fitskee, Bolding, Belt, and/or John Doe Officer 5 failed to advise any medical personnel of the provision of methamphetamine to Palmer and failed to secure emergency medical care for him.

140.   As a result of the Defendants actions, Everett Palmer suffered severe mental anguish, extreme pain, and ultimately death.

141.   Defendant Prime Care is sued in this Count under a *respondeat superior* theory of liability as Defendants Zinn, Knight, Steuffer, Webster, and Pauley were acting within the scope of their employment when they failed to provide Everett Palmer with necessary medical care.

**WHEREFORE**, Plaintiff demands judgment in her favor, and against Defendants pursuant to state law, in an amount in excess of One Million Dollars ($1,000,000.00), including interest, delay damages, costs of suit, general and specific damages, including both survival and wrongful death damages, punitive and exemplary damages as provided by law, and any other remedies legally appropriate.

## COUNT IV: VIOLATION OF THE FOURTEENTH AMENDMENT – DELIBERATE INDIFFERENCE TO A SERIOUS MEDICAL NEED
### Need for Mental Health Treatment
*Plaintiff v. Defendants John Doe Officers 1-4, Knight, Zinn, and Prime Care Medical, Inc.*

142.   The preceding paragraphs are incorporated by reference as though laid out fully herein.

143.   Defendants John Doe Officers 1-4 observed Mr. Palmer in a state of acute mental distress.

144.   It was obvious to any individual who encountered Everett that he was in need of immediate inpatient mental health treatment.

145.   Nonetheless, John Doe Officers 1-4 disregarded Mr. Palmer's mental instability and failed to alert any medical provider.

146.   In fact, the officers took steps to obfuscate his need for medical treatment by falsely recording his status as "Self-Contained Activity" or "Quiet/Seclusive."

147.   Defendants Zinn and Knight were tasked with performing wellness checks of Mr. Palmer, but despite his obvious severe mental distress, hallucinations, rambling speech, and hyperactivity, neither Defendant Zinn nor Defendant Knight took any steps to provide Mr. Palmer with additional mental health treatment or report his behavior to the prison psychiatrist.

148.   As a result of the actions of Defendants John Doe Officers 1-4, Knight, and Zinn, Everett Palmer suffered mental anguish, extreme pain and agony, and ultimately died.

149.   Defendant Prime Care is sued in this Count under a *respondeat superior* theory of liability as Defendants Knight and Zinn were acting within the scope of their employment when they refused to provide Everett Palmer with necessary medical care.

150.   Plaintiff seeks survival damages, as stated above, including for the nature and extent of Decedent's injuries, pre-death pain and suffering, emotional distress, and loss of life and enjoyment of life, as well as all available wrongful death damages available under the law.

**WHEREFORE**, Plaintiff demands judgment in her favor, and against Defendants pursuant to 42 U.S.C. § 1983, in an amount in excess of One Million Dollars ($1,000,000.00), including interest, delay damages, costs of suit, general and specific damages, including both survival and wrongful death damages, punitive and exemplary damages as provided by law, attorneys' fees under U.S.C. 1985 and 1988, and any other remedies legally appropriate.

### COUNT V: VIOLATION OF THE FOURTEENTH AMENDMENT – DELIBERATE INDIFFERENCE TO A SERIOUS MEDICAL NEED
### Need for Emergency Medical Treatment
*Plaintiff v. Defendants Emig, Cessna, Kopp, Irizarry, Clark, Lybrand, Larkin, Fink, Smith, Konasol, Zinn, Knight, Steuffer, Webster, Pauley, and Prime Care Medical, Inc.*

151.    The preceding paragraphs are incorporated by reference as though laid out fully herein.

152.    Following the assault and choking of Mr. Palmer, Defendants Emig, Cessna, Kopp, Irizarry, Clark, Lybrand, Larkin, Fink, Smith, and Konasol observed Mr. Palmer secured to the emergency restraint chair with a spit hood over his head, his face turned blue, and not breathing.

153.    Defendants Emig, Cessna, Kopp, Irizarry, Clark, Lybrand, Larkin, Fink, Smith, and Konasol took no steps to remove the spit hood, begin CPR, or place Mr. Palmer in a recovery position for more than 8 minutes after he stopped breathing.

154.    Upon arrival at medical, Defendants Zinn, Knight, Steuffer, Webster, and Pauley observed Plaintiff in the same condition.

155.    Defendants Zinn, Knight, Steuffer, Webster, and Pauley likewise took no steps to remove the spit hood, begin CPR, or place Mr. Palmer in a recovery position for more than 4 minutes and thirty seconds.

156.   After his arrival in medical, Defendants Emig, Cessna, Kopp, Irizarry, Clark, Lybrand, Larkin, Fink, Smith, Konasol, Zinn, Knight, Steuffer, Webster, and Pauley did not begin administering CPR on Everett for more than fifteen minutes.

157.   As a result of the actions of Defendants Emig, Cessna, Kopp, Irizarry, Clark, Lybrand, Larkin, Fink, Smith, Konasol, Zinn, Knight, Steuffer, Webster, and Pauley, Everett Palmer suffered mental anguish, extreme pain and agony, and ultimately death.

158.   Defendant Prime Care is sued in this Count under a *respondeat superior* theory of liability as Defendants Zinn, Knight, Steuffer, Webster, and Pauley were acting within the scope of their employment when they failed to provide Everett Palmer with necessary medical care.

159.   Plaintiff seeks survival damages, as stated above, including for the nature and extent of Decedent's injuries, pre-death pain and suffering, emotional distress, and loss of life and enjoyment of life, as well as all available wrongful death damages available under the law.

**WHEREFORE**, Plaintiff demands judgment in her favor, and against Defendants pursuant to 42 U.S.C. § 1983, in an amount in excess of One Million Dollars ($1,000,000.00), including interest, delay damages, costs of suit, general and specific damages, including both survival and wrongful death damages, punitive and exemplary damages as provided by law, attorneys' fees under U.S.C. 1985 and 1988, and any other remedies legally appropriate.

## COUNT VI: PRODUCT LIABILITY
### *Plaintiff v. Axon Enterprise, Inc.*

160.   The preceding paragraphs are incorporated by reference as though laid out fully herein.

161.   Axon Enterprise, Inc. is the manufacturer of the TASER X26 used in York County Prison.

162.   The TASER and electronic control weapons have been associated with dozens of deaths across the country.

163.   Nonetheless, Defendant Axon continues to market the TASER as a less lethal option for law enforcement.

164.   The negligent design and marketing of the TASER regularly leads to its overuse on subjects.

165.   As a result, individuals like Mr. Palmer often suffer adverse cardiac and related health incidents as a result of the TASER use.

166.   The negligent design and marketing of the TASER by Defendant Axon was responsible, in part, for Mr. Palmer's death.

167.   Plaintiff seeks survival damages, as stated above, including for the nature and extent of Decedent's injuries, pre-death pain and suffering, emotional distress, and loss of life and enjoyment of life, as well as all available wrongful death damages available under the law.

**WHEREFORE**, Plaintiff demands judgment in her favor, and against Defendants pursuant to state law, in an amount in excess of One Million Dollars ($1,000,000.00), including interest, delay damages, costs of suit, general and specific damages, including both survival and wrongful death damages, punitive and exemplary damages as provided by law, and any other remedies legally appropriate.

## COUNT VII: PRODUCT LIABILITY
*Plaintiff v. Defendant John Doe Corporation 1*

168.   The preceding paragraphs are incorporated by reference as though laid out fully herein.

169.   John Doe Corporation 1 is the manufacturer of spit hoods used in York County Prison.

---

170.   John Doe Corporation 1 markets their spit hoods as safe tools for corrections officers to use while restraining detainees.

171.   John Doe Corporation 1 was aware of asphyxiation risk and cardiac issues associated with the use of their spit hoods as a result of recent prior custodial deaths involving spit hoods, including but not limited to:

  i.   May 2009 death of Jonathan Pluck in Cambridgeshire, UK;

  ii.   May 2010 death of Brian Torgerson in Seattle, Washington;

  iii.   September 2010 death of James Perry in Milwaukee, Wisconsin;

  iv.   March 2013 death of Daniel Linsinbigler in Clay County, Florida;

  v.   November 2013 death of Michael David Jones in Davidson County, Tennessee;

  vi.   February 2015 death of Jack Marden in Midland County, Michigan;

  vii.   November 2015 death of Michael Marshall in Denver, Colorado; and,

  viii.   June 2016 death of Corey Rogers in Nova Scotia, Canada.

172.   Nonetheless, John Doe Corporation 1 continued to market and sell their product despite being aware of the known risks of custodial deaths.

173.   The spit hood manufactured and distributed by John Doe Corporation 1 was used on Everett Palmer.

174.   As a result of the assault and defects with the spit hood produced by John Doe Corporation 1, Everett Palmer asphyxiated and died.

175.   Plaintiff seeks survival damages, as stated above, including for the nature and extent of Decedent's injuries, pre-death pain and suffering, emotional distress, and loss of life and enjoyment of life, as well as all available wrongful death damages available under the law.

**WHEREFORE**, Plaintiff demands judgment in her favor, and against Defendants pursuant to state law, in an amount in excess of One Million Dollars ($1,000,000.00), including interest, delay damages, costs of suit, general and specific damages, including both survival and wrongful death damages, punitive and exemplary damages as provided by law, and any other remedies legally appropriate.

### COUNT VIII: PRODUCT LIABILITY
*Plaintiff v. Defendant John Doe Corporation 2*

176.   The preceding paragraphs are incorporated by reference as though laid out fully herein.

177.   John Doe Corporation 2 is the manufacturer of emergency restraint chairs used in York County Prison.

178.   John Doe Corporation 2 markets their emergency restraint chairs as safe tools for corrections officers to use while restraining detainees.

179.   John Doe Corporation 2 was aware of the positional asphyxiation risk associated with the use of their emergency restraint chairs.

180.   Nonetheless, John Doe Corporation 2 continued to market and sell their product despite being aware of the known risks of custodial deaths.

181.   The emergency restraint chair manufactured and distributed by John Doe Corporation 2 was used on Everett Palmer.

182.   As a result of the assault and defects with the emergency restraint chair produced by John Doe Corporation 2, Everett Palmer asphyxiated and died.

183.   Plaintiff seeks survival damages, as stated above, including for the nature and extent of

Decedent's injuries, pre-death pain and suffering, emotional distress, and loss of life and

enjoyment of life, as well as all available wrongful death damages available under the law.

**WHEREFORE**, Plaintiff demands judgment in her favor, and against Defendants pursuant to

state law, in an amount in excess of One Million Dollars ($1,000,000.00), including interest, delay

damages, costs of suit, general and specific damages, including both survival and wrongful death

damages, punitive and exemplary damages as provided by law, and any other remedies legally

appropriate.

### COUNT IX: MUNICIPAL LIABILITY
*Plaintiff v. York County and York County Prison Board*

184.   The preceding paragraphs are incorporated by reference as though laid out fully herein.

### Lack of Policies and Training

185.   York County and the York County Prison Board have lack sufficient policies and training

relating to:

    i.   Observation and treatment of individuals in isolation;

    ii.   Observation and treatment of individuals exhibiting mental illness;

    iii.   Observation and treatment of individuals placed on suicide watch;

    iv.   Identification and response to mental health crises;

    v.   The use of tasers;

    vi.   The use of restraint chairs;

    vii.   The use of spit hoods;

    viii.   The use of choke holds;

---

Plaintiff's First Amended Complaint

    ix.  Providing medical care to mentally unstable individuals;

    x.  Providing medical care to drugged or intoxicated individuals;

    xi.  Providing medical care to acutely injured individuals

186.  Upon information and belief, York County does not train its prison guards on proper strategies, techniques, their legal responsibilities, or the limits of their legal authority as it relates to the use of force by corrections officers, screening and treatment of mental health issues, confrontations with mentally unstable individuals or obtaining and/or providing acute critical medical care.

187.  As a result of the lack of policies and training by York County, York County prison guards are woefully unequipped to handle these situations and are ignorant of the limits of their lawful authority.

188.  Additionally, due to short staffing during this time period, York County and the York County Prison Board adopted a de facto policy of allowing officers to serve on the CERT team without completing the requisite training program.

189.  This resulted in untrained officers being used on the CERT team for the cell extraction of Everett Palmer and contributed to the use of unprofessional, unnecessary, and deadly force against him.

190.  York County's lack of policies and training were a moving force behind the deprivation of Everett Palmer's constitutional rights.

## Custom of Excessive Force and Inmate Abuse

191.  The unchecked use of violence and excessive force against inmates at York County is widespread.

192.    In 2013, York County Prison Guards Graff, Whitcomb, and Haynes organized what they called the "Retard Olympics."

193.    The prison guards would force inmates to "do stupid stuff for food and coffee."

194.     The guards forced one inmate to drink a gallon of milk in an hour, eat a spoonful of cinnamon, and drink water with pepper foam in it among other degrading tasks.

195.    Being unsatisfied with sophomoric pranks, the guards would force inmates to wrest them or subject them to physical violence.

196.    Guards Graff and Whitcomb beat one inmate about his arms and legs until they went numb.

197.    Prison guard Whitcomb once bribed an inmate with food to permit him to choke out the inmate.

198.    Additionally, the guards arranged a "fight club" in which they would force inmates to fight each other in a storage closet while the guards watched.

199.    In 2016, prison guards viciously assaulted two ICE detainees following a dispute regarding the number of blankets the detainees were allowed to have.

200.    A captain sprayed the detainees with mace while a member of the prison Certified Emergency Response Team (CERT team) physically beat the other detainee in an effort to punish the two detainees.

201.    The beating resulted in one detainee suffering broken dentures from being slammed on a table, as well as knee and elbow injuries.

202.    More than four days passed before he was seen for medical care.

203. When a grievance was filed, the York County Warden covered up the vicious assault by defending the CERT team for utilizing a "new technique" on the detainee.

204. In May of 2017, prison guards Cessna, Velasquez, Fitski, and others engaged in a savage beating of inmate Aaron Ornstein.

205. The guards became annoyed with how slowly Ornstein was moving and kicked his legs causing him to fall.

206. Once he fell, the guards began kneeing, punching and kicking Ornstein while he was on the ground.

207. As a result of the beating, Ornstein required stitches to his eye.

208.  Additionally, he suffered a broken clavicle which caused his right lung to fill with 3.5 liters of blood resulting in difficulty breathing.

209. A complaint filed by Ornstein was ignored by Warden Doll, and Ornstein was punished for the incident.

210. Inmate abuse at the York County Prison was not limited to physical violence.

211. There has existed a long history of York County Prison Guards trafficking illegal drugs into the prison.

212. Warden Doll, York County Prison Board, and York County either actively encourage the behavior by overlooking the trafficking or are completely incompetent to stop the known illicit conduct.

213. During 2018, York County Prison Guard Amanda Anderson was actively trafficking heroin and contraband within York County Prison.

214.   Anderson was arrested in June of 2018, however this did nothing to slow the trafficking of drugs by prison guards in York County.

215.   On January 23, 2020, an inmate at York County Prison was treated for an overdose.

216.   York County and Warden Doll attempted to cast aside suspicion of prison guards trafficking drugs and claimed that the inmate had smuggled the drugs in himself, however at the time of the overdose the inmate had been in custody for approximately 49 days.

217.   In April of 2020, York County inmate Matthew Hughes was arrested for trafficking narcotics within the York County jail.

218.   In June of 2020, York County corrections officer Joshua Martinez was arrested for attempting to traffic narcotics in the York County Prison.

219.   The widespread custom of excessive force and inmate abuse was ratified and tolerated by York County and the York County Prison Board.

220.   This widespread custom and practice was a moving force behind the death of Everett Palmer, Jr.

**WHEREFORE**, Plaintiff demands judgment in her favor, and against Defendants pursuant to 42 U.S.C. § 1983, in an amount in excess of One Million Dollars ($1,000,000.00), including interest, delay damages, costs of suit, general and specific damages, including both survival and wrongful death damages, punitive and exemplary damages as provided by law, attorneys' fees under U.S.C. 1985 and 1988, and any other remedies legally appropriate.


Respectfully submitted,

/s/ John J. Coyle                                    Date: July 8, 2020
John J. Coyle, Esq.


**McELDREW YOUNG**                           MERRITT LAW
Daniel N. Purtell, Esquire                      S. Lee Merritt, Esquire
  PA Attorney I.D. No.: 310376                    PA Attorney I.D. No.: 314891
John J. Coyle, Esquire
  PA Attorney I.D. No.: 312084                  123 S. Broad Street, Suite 2250
                                                Philadelphia, PA 19109
123 S. Broad Street, Suite 2250                 (215) 545-8800
Philadelphia, PA 19109                          lee@leemerrittesq.com
(215) 545-8800
jim@mceldrewyoung.com                           *Pro Hac Vice Application Forthcoming*
dpurtell@mceldrewyoung.com
jcoyle@mceldrewyoung.com