IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| ROSE PALMER, AS ADMINISTRATRIX OF THE ESTATE OF EVERETT PALMER, JR., DECEASED | : <br> : <br> : <br> : |
| Plaintiff, | : |
| v. | : |
| YORK COUNTY, PENNSYLVANIA | : Civil Action No. 1:20-cv-00539 <br> : |
| AND | : |
| YORK COUNTY PRISON BOARD | : JURY TRIAL DEMANDED <br> : |
| AND | : |
| CORRECTIONS OFFICER ERIC EMIG | : <br> : |
| AND | : |
| CORRECTIONS OFFICER NICHOLAS CESSNA | : <br> : |
| AND | : |
| CORRECTIONS OFFICER DONALD KOPP | : <br> : |
| AND | : |
| CORRECTIONS OFFICER TIMOTHY IRIZARRY | : <br> : <br> : |
| AND | : |
| CORRECTIONS OFFICER GREGGORY CLARK | : <br> : |
| AND | : |
| CORRECTIONS OFFICER WILLIAM LYBRAND | : <br> : |
| AND | : |
| CORRECTIONS OFFICER TYLER LARKIN | : |

| | |
|---|---|
| | : |
| AND | : |
| | : |
| CORRECTIONS OFFICER MAX FINK | : |
| | : |
| AND | : |
| | : |
| CORRECTIONS OFFICER WAYNE SMITH | : |
| | : |
| AND | : |
| | : |
| CORRECTIONS OFFICER TED KONASOL | : |
| | : |
| AND | : |
| | : |
| CORRECTIONS OFFICER NATHAN FITSKEE | : |
| | : |
| AND | : |
| | : |
| CORRECTIONS OFFICER STEVEN BOLDING | : |
| | : |
| AND | : |
| | : |
| CORRECTIONS OFFICER RONALD BELT | : |
| | : |
| AND | : |
| | : |
| JOHN DOE OFFICERS 1-5 | : |
| | : |
| AND | : |
| | : |
| NURSE DAVID ZINN | : |
| | : |
| AND | : |
| | : |
| CATHERINE STEUFFER | : |
| | : |
| AND | : |
| | : |
| JOANNE WEBSTER | : |
| | : |
| AND | : |
| | : |
| DIANNA KNIGHT | |

AND

NURSE JOSHUA PAULEY

AND

KATHLEEN SHIELDS

AND

BRYCE LEFEVER

AND

JOHN DOE PRIMECARE EMPLOYEE

AND

PRIMECARE MEDICAL, INC.

AND

AXON ENTERPRISE, INC.

AND

JOHN DOE CORPORATIONS 1-2

Defendants.

## SECOND AMENDED CIVIL ACTION COMPLAINT

**NOW COMES** Rose Palmer as duly appointed administrator of the Estate of Everett Palmer, Jr., deceased, by and through chosen counsel Daniel Purtell, Esquire and John J. Coyle, Esquire of McEldrew Young Purtell and S. Lee Merritt of Merritt Law Office, complaining of the conduct of the named defendants, and in support thereof states the following:

## NATURE OF THE ACTION

1.  On April 7, 2018, Everett Palmer Jr. travelled from his residence in Delaware to York County, Pennsylvania to resolve an open warrant related to an old DUI charge. The personal trainer and U.S. Army veteran arrived in York County sober, healthy and in good spirits. Mr. Palmer was booked and taken to York County Jail where he was placed in a solitary confinement. Two days later, Everett Palmer Jr. was dead. His body was covered in bruises. His blood was filled with methamphetamine.

## PARTIES

2.  Plaintiff, Rose Palmer, is an adult individual, the mother of Everett Palmer, Jr., and the administratrix of his Estate.

3.  Plaintiff, Rose Palmer, has been designated as Administratrix of the Estate of Everett Palmer, Jr., deceased, by the remaining parent and natural guardian of Everett Palmer's two surviving minor children, M.E.B. and M.D.B.

4.  Defendants Eric Emig, Nicholas Cessna, Donald Kopp, Timothy Irizarry, Greggory Clark, William Lybrand, Tyler Larkin, Max Fink, Wayne Smith, Ted Konasol, Brandon Schneider, Nathan Fitzkee, Steven Bolding, Ronald Belt, and John Doe Officers 1-5 were at all times relevant herein acting under color of state law in the scope and course of their duties as prison guards with the York County Prison. These defendants are being sued in their individual capacity.

5.  Defendant York County is a county organized pursuant to the laws of the Commonwealth of Pennsylvania. York County owns and operated the York County Prison, and along with Defendant York County Prison Board and Defendant Warden Clair Doll is responsible for the implementation of the prison's budget, personnel, staffing, training, policies, procedures,

practices, and customs.  York County may be served at the Office of the York County Administrator, 28 E. Market Street, York, PA 17401.

6.      Defendant York County Prison Board operated York County Prison on behalf of York County pursuant to state law.  York County Prison Board may be served at the Office of the York County Administrator, 28 E. Market Street York, PA 17401.

7.      Defendants David Zinn, Catherine Steuffer, Joanne Webster, Diana Knight, Joshua Pauley, Kathleen Shields, Dr. Bryce Lefever, and John Doe PrimeCare Employees 1-2 are employees of PrimeCare who provide medical services within York County Prison.

8.      PrimeCare Medical, Inc. is a corporation with its principle place of business located at 3940 Locust Lane Harrisburg, PA 17109.

9.      Defendant Axon Enterprise, Inc. is a corporation engaged in the business of the manufacture and distribution of electronic control weapons, specifically the TASER X26, used by officers at York County Prison.  Defendant Axon is incorporated under the laws of the State of Delaware and maintains a principle place of business at 17800 N. 85th St. Scottsdale, AZ 85255.

10.     Defendant John Doe Corporation 1 is a corporation engaged in the manufacture and sale of spit hoods supplied to and used within York County Prison.

11.     Defendant John Doe Corporation 2 is a corporation engaged in the manufacture and sale of emergency restraint chairs supplied to and used within York County Prison.

12.     Defendant Claire Doll is the Warden of the York County Prison.  He may be served at the Office of the York County Administrator, 28 E. Market Street York, PA 17401.

## JURISDICTION AND VENUE

13. Jurisdiction and Venue are proper in this Honorable Court as Defendants' constitutional violations, intentional torts, and otherwise violative conduct occurred in York County, Pennsylvania.

## FACTS RELATED TO
## THE UNLAWFUL KILLING OF EVERETT PALMER, JR.

14. Everett Palmer Jr. was a 41-year-old father of two.

15. The former U.S. Army paratrooper was in good health and worked as a personal trainer in Seaford, Delaware.

16. On April 7, 2018, Everett traveled to York County, Pennsylvania to voluntarily address an old warrant for a DUI charge.

17. Everett had recently become aware of the charge and wanted to resolve it while on his way to New York to visit his family.

18. Everett drove himself to York County.

19. Upon arrival, Everett was sober and in good spirits.

20. He was taken into custody and brought before Magisterial District Judge Scott J. Gross at approximately 8:25PM.

21. Despite Mr. Palmer voluntarily turning himself in to resolve this old DUI charge, Judge Gross ordered Mr. Palmer held on $5,000 bail.

22. Because he did not have enough money on his person to pay the bail, Everett Palmer was remanded to the custody of the York County Prison.

23. At approximately 9:45 PM, Palmer was brought to intake processing at York County Jail.

24. At processing, Palmer appeared calm, remained unrestrained, and chatted calmly with the Sheriff's officers who brought him to jail.

25. Defendant Kathleen Shields completed an intake screening.

26. Palmer was also observed to be non-responsive and mumbling to himself.

27. Ms. Shields noted that Mr. Palmer had a mental illness and was uncapable of completing the mental health screening.

28. Ms. Shields' noted of Mr. Palmer, "unable to complete screen pt rambling not making sense pt would stand up and stair off into distance pt couldn't make up his mind if he wanted to hurt himself or not placed on sp/cw until seen by mh."

29. Nonetheless, Ms. Shields did not refer Mr. Palmer to emergency medical care, rather she simply assigned him to suicide watch because he could not complete the screening.

30. As a result of this determination, Palmer isolated in a cell by himself without direct contact with any other inmates.  Additionally, Palmer was put on a 24/7 watch.

31. Later that evening, Everett Palmer began to descend into a mental breakdown.  This is first evidenced by conversations between Palmer and John Doe Officers 1-2 in which Palmer relayed hallucinating the presence of two individuals outside his window.

32. Despite being present for the purpose of observing Palmer's mental state, John Doe Officers 1-2 did not report Palmer's hallucinations to any medical provider.

33. Rather, on the York County Prison SMU Check Sheet, John Doe Officers 1-2 record Palmer's mental state as "Quiet/Seclusive", further obfuscating the true nature of Palmer's mental condition from treating providers.

34.    Palmer's mental health further destabilized as the night progresses.  Between the hours of 1:20 AM and through 2:45AM on the morning of April 8, banging and howling from other cells led Palmer to enter an agitated state.

35.    During this period, Palmer began screaming and howling at the prison guards.

36.    Eventually, Palmer mental break down became so severe that he stripped naked and rubbed urine on himself while screaming out the door at the guards assigned to observe him.

37.    Palmer ripped his mattress off his bed and stood on the platform screaming at the officers.

38.    In response, John Does 3-4 joked "He's not that big" and otherwise ignored the deteriorated mental state of Palmer.

39.    Additionally, John Does 3-4 disregarded Palmer's severe mental breakdown and never reported it to any medical provider.

40.    John Does 3-4 diminished the event and failed to provide proper medical care when they recorded Palmer's behavior between 1:15AM and 2:45 AM on the York County Prison SMU Check Sheet as "Self-Contained Activity" or "Quiet/Seclusive."

41.    Additionally, at 2:59 AM, surveillance video demonstrates Defendant Dianna Knight arrived at Palmer's cell for her scheduled wellness check.

42.    Surveillance video depicts Defendant Knight conversing with the officers, however the officers failed to inform Defendant Knight of Mr. Palmer's severe and potentially self-harming behavior.

43.    Defendant Knight spent 24 seconds at the cell door of Everett Palmer completing her wellness check.

44. Of those 24 seconds, Defendant Knight looked through the window into Mr. Palmer's cell for 8 seconds. The remainder of the time she was facing and speaking to the guards.

45. Defendant Knight entered the results of her visit in the medical chart as "Wellness checks done, inmate lying on bunk, respirations observe [sic], no complaints voiced."

46. However, identically timestamped surveillance video from inside Palmer's cell shows a much different picture. Palmer is face down, naked, and unconscious, lying on the floor of his cell. His mattress is ripped off the bunk and laying by the door.

47. Information regarding Palmer's mental breakdown was never communicated to the mental health specialist tasked with evaluating Palmer, Dr. Bryce Lefever.

48. Dr. Lefever saw Mr. Palmer at 6:08AM on April 8, 2018. Dr. Lefever noted evidence of thought disorder or perceptual disturbance and determined that Mr. Palmer was unstable.

49. Dr. Lefever testified to a York County Grand Jury that the interview only last ten minutes during which Mr. Palmer was having active hallucinations and could not recall the date.

50. Dr. Lefever testified that he ended the interview early because Mr. Palmer was not "in the kind of control that I would want him to be in in an interview of that nature with the two of us behind closed doors."

51. Dr. Lefever assessed psychosis in Mr. Palmer.

52. Despite determining that Mr. Palmer was "too unstable to fully evaluate," Dr. Lefever failed to refer Mr. Palmer out to a mental health facility but was rather returned him to his cell.

53. From Mr. Palmer's return from his evaluation with Dr. Lefever until 4:00PM, Defendants Fitzkee, Bolding, and Belt were assigned to observe Mr. Palmer.

54. During this period, Mr. Palmer continued to behave erratically and demonstrated hallucinations, including speaking to his smock and expecting it to answer his questions.

55. Despite, Mr. Palmer's obvious disoriented state, Defendants Fitzkee, Bolding, and Belt took no steps to provide adequate mental health care to Mr. Palmer.

56. At approximately, 5:15 PM and again at 8:00PM, John Doe PrimeCare Employee with the assistance of a yet unidentified officer provided an unknown substance to Mr. Palmer.

57. The provision of this substance was not noted in the medical chart produced prior to the filing of this Amended Complaint.

58. Mr. Palmer continued to demonstrate hallucinations and dissociative thought processes from 5pm onward, yet no corrections officer or PrimeCare employee ever attempted to get Mr. Palmer the help he so obviously needed.

59. Later that same evening, Palmer became agitated and his mental stability deteriorated.

60. Around 2:00AM on April 9, Mr. Palmer's mental status began to rapidly and severely deteriorate towards violence.

61. He demonstrated outward signs of being in an acute mental health episode as early as 2:06 AM when he tore his mattress and blanket off the bed and began searching the toilet bowl for something.

62. By 2:45 AM, Everett was screaming at hallucinations on the ceiling and put his mattress over the door.

63. By 2:50 AM, Everett was attempting to throw his blanket over the surveillance camera in his cell.

64. By 2:58 AM, Everett was in a full psychotic break, yelling incoherently and climbing on top of the sink in his cell.

65. Despite these outward signs that Mr. Palmer was in need of immediate medical assistance, Defendant Emig and Defendant Cessna failed to notify medical of Mr. Palmer's behavior.

66. Instead, Emig and Cessna wrote Mr. Palmer an infraction for placing his mattress over his cell door.

67. By 3:11 AM, Palmer had stripped naked and was incoherently screaming.

68. Throughout this time, medical services were never called and Mr. Palmer's condition was recorded as either "Quiet/Seclusive" or "Self-Contained Activity" on the SMU Check Sheet.

69. At 3:30 AM, Defendant Zinn came to Mr. Palmer's cell to do the scheduled wellness check.

70. No corrections officer informed Defendant Zinn of Mr. Palmer's deteriorating mental health.

71. Defendant Zinn remained at Mr. Palmer's door for 11 seconds before walking away.

72. Defendant Zinn recorded in the medical chart "Patient seen at cell door for wellness check. Patient kneeling behind cell door. Patient refused to respond to medical staff, patient rambling, incoherent. Basic needs provided for."

73. Contemporaneous surveillance footage from inside the cell indicates that Mr. Palmer was naked and speaking to himself incoherently.

74. Defendant Zinn did nothing to address Mr. Palmer's need.

75.   Defendant Zinn neither referred Mr. Palmer to outside medical care or alerted the jail psychologist.

76.   For the next 25 minutes, Mr. Palmer continued to scream and yell incomprehensibly, crawl and run around his cell naked, and try to remove his sink and toilet from the wall while Defendants watched but took no action.

77.   Mr. Palmer was further agitated by Corrections Officers – believed to be Defendants Emig and Lybrand – who told him "hey, I think they're listening to you through that food" and "they're listening to us... the po-po."

78.   Mr. Palmer continued to spiral further and further into psychosis while working himself into a sweat.

79.   Mr. Palmer began injuring himself, slamming his fist, feet, and eventually his head into the cell door.

80.   Medical personnel were never called to sedate or otherwise treat Mr. Palmer.

81.   Instead, the prison's tactical unit, the CERT team was called to respond.

82.   The prison CERT team consisting of Defendants Eric Emig, Nicholas Cessna, Donald Kopp, Timothy Irizarry, Greggory Clark, William Lybrand, Tyler Larkin, Max Fink, Wayne Smith, and Ted Konasol gathered at Mr. Palmer's door.

83.   Everett was advised to lay on the ground and put his hands behind his back, and he did so for a brief period.

84.   However, the CERT team did not enter the cell to handcuff him.

85.   At approximately 4:17 AM, the door was opened and Defendant Cessna deployed a TASER at Mr. Palmer despite the fact that Mr. Palmer was standing near the door with his hands clasped in front of him to be cuffed.

86.   Mr. Palmer recoiled to the back of the room after being struck by the TASER.

87.   At that point, Defendant Clark led a charge at Mr. Palmer, jumping on top of him with a tactical shield.

88.   At least six other defendants including Defendants Emig, Cessna, Kopp, Irizarry, Clark, Lybrand, Larkin, Fink, Smith, and/or Konasol followed into the cell piling on top of, striking, kicking, and standing on Mr. Palmer.

89.   Defendant Cessna deployed his TASER on Mr. Palmer at least two more times.

90.   Defendant Kopp deployed his TASER on Mr. Palmer as well.

91.   Palmer lay at the bottom of the pile of officers for 3 minute and 7 seconds.

92.   At some point, a spit hood was placed over Mr. Palmer's face severely restricting his ability to breathe.

93.   Palmer was then carried out of the cell with his arms and legs shackled.

94.   Palmer was placed in an Emergency Restraint Chair and held with his arms over his head.

95.   As the CERT officers worked on the shackles and restrained Palmer's arms over his head, Palmer obviously struggled for oxygen.

96.   Everett's chest was heaving and his face turned blue, an obvious symptom of oxygen deprivation.

97.   Everett stopped breathing and went unconscious in the Emergency Restraint Chair.

98.   Despite the fact that Palmer's chest had stopped moving, his face was blue, he ceased moving, and he appeared unconscious, the CERT team failed to remove the spit hood and restraint chair even as they transported him to medical.

99.   Upon arriving at medical Defendants Zinn, Steuffer, Webster, and Knight met with Mr. Palmer.

100.  Mr. Palmer showed no signs of breathing and had little to no pulse upon arrival in the medical unit.

101.  Nevertheless, the CERT team Defendants and the PrimeCare Defendants failed to remove the spit hood and restrain chair.

102.  Mr. Palmer remained in the spit hood and restraint chair for 8 minutes and 13 seconds after he stopped breathing.

103.  Everett Palmer, Jr. was declared dead at a local hospital later that morning, a result of asphyxiation.

104.  Post-mortem analysis indicated that his blood contained an extremely high level of methamphetamine and amphetamine in his system.

105.  Specifically, at the time of the blood draw following his death, Everett had blood toxicology levels of 625 ng/mL of methamphetamine and 130 ng/mL of amphetamine. There was no alcohol in Everett's system.

106.  Based upon the level of methamphetamine in Everett's blood at death, the half-life of methamphetamine, and the time Everett was in custody, it is impossible for Everett to have consumed all of the methamphetamine prior to turning himself in to York County Authorities.

107. Upon information and belief, the methamphetamine in Everett's since came from the previously described hand to hand drug transfer.

108. An autopsy was performed on Everett by Dr. Rameen Starling-Roney of the York County Coroner's Office.

109. The autopsy report produced by the County noted that Palmer had significant bruising and lacerations all over his body, including:

- Two puncture defects on the right forearm

- 3" x 1.25" contusion on the right hand

- 6.25" x. 5" contusion on the right forearm, elbow, and arm

- 5" x 4" contusion with abrasions on the left elbow, forearm, and arm

- 6" x 2.5" contusion on the right lower leg

- 4" x .75" abrasion on the left lower leg

- 1" abrasion on the frontal scalp

- 1.25" abrasion on the mid-parietal scalp

- Two 1.25" - 1.5" abrasions on the left temporal scalp

- .5" abrasion on the right side of the upper chest

- .25" x .125" abrasion of the left torso

- .1875" x .125" abrasion of the left hip

- Hemorrhage/blood extravasation along the soft tissue in both elbows

110. Despite numerous requests, Plaintiff has not been provided the available photographs in support of the above described injuries.

111.   Contrary to the National Association of Medical Examiners position paper on Deaths in Custody, Dr. Starling-Roney refused to conclude Everett's death was a homicide and instead ruled the cause of death as "undetermined."

112.   However, the findings detailed in the autopsy included microscopic changes consistent with hypoxic ischemia and lead to the unambiguous medical conclusion that Everett died from asphyxiation.

113.   This asphyxiation was likely caused by physical abuse, restraint, and the application of a spit-hood.

114.   Following the autopsy, Everett's body was released to his family so that a private second autopsy could be performed.

115.   At that time, Everett's heart, brain, throat and hyoid bone had been removed from his body and were not produced to the family.

116.   While the autopsy report prepared by Dr. Starling-Roney indicates that the brain and heart were retained for further examination, the report makes no note of the removal or retention of Everett's throat and hyoid bone.

117.   In fact, the report makes no mention of any injuries to the throat to warrant additional examination.

118.   When asked about the location of the throat, the York County Coroner originally indicated it had been turned over to the funeral home for family.

119.   That remained the Coroner's official position for nearly two weeks until the Office changed course and claimed that the throat had been retained along with the other organs and sent to a private laboratory where it was being held.

120.    Requests to retrieve the organs for DNA testing and pathological evaluation have been refused.

## WRONGFUL DEATH ACTION

121.    Plaintiff, Rose Palmer, as appointed by the parent and natural guardian of the minor children of Everett Palmer, Jr., hereby brings Wrongful Death claims pursuant to 42 Pa.C.S. §8301 (the Pennsylvania Wrongful Death Statute) and Pa.R.C.P. 2202(a), on behalf of all those persons entitled by law to recover damages as a result of the wrongful death of Everett Palmer, Jr.

122.    The names and address of all persons legally entitled to recover due to the wrongful death of Everett Palmer is Mychele Boykin, as property guardian and p/n/g of M.E.B. and M.D.B.

123.    No other action has been brought to recover for Mr. Palmer's death under the aforementioned statute(s).

124.    Plaintiff claims all available damages under the Pennsylvania Wrongful Death Statute for financial contributions and the loss of future services, support, society, comfort, affection, guidance, tutelage, and contribution that the Plaintiff's decedent, Everett Palmer, Jr., would have rendered to the wrongful death beneficiaries but for his traumatic, untimely and unnatural death.

125.    Plaintiff claims damages for payment for all medical bills and/or expenses.

126.    Plaintiff claims damages for payment of funeral and burial expenses.

## SURVIVAL ACTION

127.    Plaintiff also brings a Survival Action under the Pennsylvania Survival Statute, 42 Pa.C.S. § 8302, and pursuant to 20 Pa.C.S. § 3373, for all damages recoverable under the Statute,

including but not limited to, loss of income both past and future income potential, as well as, pain and suffering prior to death, and for emotional distress suffered by Plaintiff's decedent, Everett Palmer, Jr., from the initiation of the assault upon him until the ultimate time of his death.

## COUNT I: VIOLATION OF THE FOURTEENTH AMENDMENT – EXCESSIVE FORCE ON A PRETRIAL DETAINEE

*Plaintiff v. Eric Emig, Nicholas Cessna, Donald Kopp, Timothy Irizarry, Gregory Clark, William Lybrand, Tyler Larkin, Max Fink, Wayne Smith, and Ted Konasol*

128.    The preceding paragraphs are incorporated by reference as though laid out fully herein.

129.    Defendants Emig, Cessna, Kopp, Irizarry, Clark, Lybrand, Larkin, Fink, Smith, and Konasol crushed Everett Palmer, beat him, choked him, tased him, restrained him and failed to obtain necessary and timely medical care all contributing to and causing his untimely and unnatural death.

130.    The actions of Defendants Emig, Cessna, Kopp, Irizarry, Clark, Lybrand, Larkin, Fink, Smith, and Konasol were intentional, objectively unreasonable and were not rationally related to any legitimate non-punitive governmental purpose.

131.    As a result of the actions of Defendants Emig, Cessna, Kopp, Irizarry, Clark, Lybrand, Larkin, Fink, Smith, and Konasol, Everett Palmer suffered mental anguish, extreme pain,agony and ultimately death.

132.    Plaintiff seeks survival damages, as stated above, including for the nature and extent of Decedent's injuries, pre-death pain and suffering, emotional distress, and loss of life and enjoyment of life, as well as all available wrongful death damages available under the law.

**WHEREFORE**, Plaintiff demands judgment in her favor, and against Defendants pursuant to 42 U.S.C. § 1983, in an amount in excess of One Million Dollars ($1,000,000.00), including interest, delay damages, costs of suit, general and specific damages, including both survival and wrongful death damages, punitive and exemplary damages as provided by law, attorneys' fees under U.S.C. 1985 and 1988, and any other remedies legally appropriate.

### COUNT II: ASSAULT AND BATTERY

*Plaintiff v. Eric Emig, Nicholas Cessna, Donald Kopp, Timothy Irizarry, Gregory Clark, William Lybrand, Tyler Larkin, Max Fink, Wayne Smith, and Ted Konasol*

133.   The preceding paragraphs are incorporated by reference as though laid out fully herein.

134.   Defendants Emig, Cessna, Kopp, Irizarry, Clark, Lybrand, Larkin, Fink, Smith, and Konasol crushed Everett Palmer, choked him, tased him, restrained him, and failed to obtain necessary and timely medical care all contributing to and causing his untimely and unnatural death.

135.   The actions of Defendants Emig, Cessna, Kopp, Irizarry, Clark, Lybrand, Larkin, Fink, Smith, and Konasol were intentional, objectively unreasonable and constituted willful misconduct, a crime, and actual malice.

136.   As a result of the actions of Defendants Emig, Cessna, Kopp, Irizarry, Clark, Lybrand, Larkin, Fink, Smith, and Konasol, Everett Palmer suffered mental anguish, extreme pain, agony and ultimately death.

137.   Plaintiff seeks survival damages, as stated above, including for the nature and extent of Decedent's injuries, pre-death pain and suffering, emotional distress, and loss of life and enjoyment of life, as well as all available wrongful death damages available under the law.

**WHEREFORE**, Plaintiff demands judgment in her favor, and against Defendants pursuant to state law, in an amount in excess of One Million Dollars ($1,000,000.00), including interest, delay damages, costs of suit, general and specific damages, including both survival and wrongful death damages, punitive and exemplary damages as provided by law, and any other remedies legally appropriate.

## COUNT III: VIOLATION OF THE FOURTEENTH AMENDMENT – DELIBERATE INDIFFERENCE TO A SERIOUS MEDICAL NEED
### Need for Mental Health Treatment
*Plaintiff v. Defendants John Doe Officers 1-4, Emig, Cessna, Lybrand, Fitskee, Bolding, Belt, Knight, Zinn, Shields, Lefever, and PrimeCare Medical, Inc.*

138.    The preceding paragraphs are incorporated by reference as though laid out fully herein.

139.    Defendant Shields and Lefever were both tasked with assessing Mr. Palmer's mental health needs. Despite both observing hallucinations, dissociative thought, and potentially dangerous thoughts, neither Shields nor Lefever took any steps to provide Mr. Palmer with the appropriate mental health care.

140.    Defendants John Doe Officers 1-4, Emig, Cessna, Lybrand, Fitskee, Bolding, and Belt observed Mr. Palmer in a state of acute mental distress while he was in his cell.

141.    It was obvious to any individual who encountered Everett that he was in need of immediate inpatient mental health treatment.

142.    Nonetheless, Defendants disregarded Mr. Palmer's mental instability and failed to alert any medical provider.

143.    In fact, the officers took steps to obfuscate his need for medical treatment by falsely recording his status as "Self-Contained Activity" or "Quiet/Seclusive."

144.   Defendants Zinn and Knight were tasked with performing wellness checks of Mr. Palmer, but despite his obvious severe mental distress, hallucinations, rambling speech, and hyperactivity, neither Defendant Zinn nor Defendant Knight took any steps to provide Mr. Palmer with additional mental health treatment or report his behavior to the prison psychiatrist.

145.   As a result of the actions of Defendants John Doe Officers 1-4, Knight, and Zinn, Everett Palmer suffered mental anguish, extreme pain and agony, and ultimately died.

146.   Defendant PrimeCare is sued in this Count under a *respondeat superior* theory of liability as Defendants Knight and Zinn were acting within the scope of their employment when they refused to provide Everett Palmer with necessary medical care.

147.   To the extent PrimeCare cannot be held liable under a *respondeat superior* theory, PrimeCare is also liable based upon their custom, policy, and practice of failing to provide adequate mental health care to inmates in violation of the Fourteenth Amendment.

**PrimeCare's Pattern of Providing Inadequate Mental Health Care**

148.   PrimeCare has a long and detailed history of providing substandard mental health care and refusing to refer individuals suffering acute mental health episodes to in-patient care, and they have failed to implement policies or training to rectify these failures.

149.   In March 2010, Robert Stewart came under the care of PrimeCare at Chester County Prison.  His initial screening was performed by a PrimeCare employee named Blakely who had no training or licensure to permit her to perform such an evaluation.  As a result, Mr. Stewart's screening was substandard and PrimeCare failed to provide proper mental health care to Mr. Stewart despite his admission that he was bi-polar, schizophrenic, and had

previously been hospitalized in a mental health institution.  Mr. Stewart began suffering from auditory hallucinations in his cell.  Rather than refer Mr. Stewart for in-patient medical care or provide additional mental health care, PrimeCare ordered him placed in a straight jacket, injected with an unknown drug, and placed in general population where he subsequently fell off a bunk and was rendered a quadriplegic.  PrimeCare resolved the constitutional claims filed against them as part of a seven-figure settlement.

150.   On February 17, 2020, Gregory Scheaffer died from suicide while under the care of PrimeCare.  Mr. Scheaffer had previously admitted to suicidal ideations but due to a deficient screening by an unqualified PrimeCare employee, Mr. Scheaffer did not receive any mental health care.  PrimeCare's failures subsequently resulted in Mr. Schaeffer's death.

151.   On March 22, 2009, Miryen Barbaros was found dead in his cell as the result of suicide.  A jury found PrimeCare and its employees liable for a Fourteenth Amendment violation for failing to provide adequate mental health care to Mr. Barbaros and returned a nearly $12 million dollar verdict.  The jury found the PrimeCare was utilizing unqualified individuals to perform mental health evaluations, provided a qualified mental health practitioner for only a few hours ever other week, and failed to refer out or provide adequate mental health services to Barbaros.

152.   On January 1, 2012, Andrew Czonska committed suicide in his cell after PrimeCare failed to properly screen him for mental health issues.

153.   On January 16, 2014, Frank Reichl-Pritchard died from self-inflicted injuries after PrimeCare failed to properly screen him and failed to properly monitor his condition.

154.   On July 5, 2015, Bryan Applegate was under the care of PrimeCare at Northampton County Prison.  Mr. Applegate had previously attempted suicide multiple times. Nonetheless, due to PrimeCare's failure to provide adequate mental health screening and care, Mr. Applegate was removed from 24/7 suicide watch and promptly killed himself. PrimeCare paid a six-figure settlement to resolve deliberate indifference claims against it.

155.   In March of 2017, PrimeCare failed to provide proper mental health care to Kyle Flyte who was in custody at Northampton County Prison.  Mr. Flyte's mental health difficulties were ignored and he was improperly moved off suicide watch. The following day Mr. Flyte committed suicide.  PrimeCare paid a six-figure settlement to resolve deliberate indifference claims against it and its employees.

156.   Common throughout these cases are policies and practices of PrimeCare that routinely resulted in substandard and unconstitutional care:

   a.   PrimeCare fails to maintain a full-time mental health professional at its facilities and limits the time a mental health practitioner is available to a few hours every other week. This leaves PrimeCare incapable of adequately responding to mental health needs of inmates.

   b.   PrimeCare allows unqualified employees to perform initial screenings.  As a result, inmates are not afforded proper services or in-patient treatment.

   c.   PrimeCare refuses to refer inmates in severely disturbed mental states to in-patient medical care.

157.   Despite knowledge of these and dozens of other institutes of failures in providing mental health care, PrimeCare has not addressed its policies or properly trained its staff in identifying mental health needs and arranging for proper care.

158.   As a result of PrimeCare's policies and practices, Everett Palmer's 14th Amendment rights were violated, resulting in his death.

159.   Plaintiff seeks survival damages, as stated above, including for the nature and extent of Decedent's injuries, pre-death pain and suffering, emotional distress, and loss of life and enjoyment of life, as well as all available wrongful death damages available under the law.

**WHEREFORE**, Plaintiff demands judgment in her favor, and against Defendants pursuant to 42 U.S.C. § 1983, in an amount in excess of One Million Dollars ($1,000,000.00), including interest, delay damages, costs of suit, general and specific damages, including both survival and wrongful death damages, punitive and exemplary damages as provided by law, attorneys' fees under U.S.C. 1985 and 1988, and any other remedies legally appropriate.

## COUNT IV: VIOLATION OF THE FOURTEENTH AMENDMENT – DELIBERATE INDIFFERENCE TO A SERIOUS MEDICAL NEED
### Need for Emergency Medical Treatment
*Plaintiff v. Defendants Emig, Cessna, Kopp, Irizarry, Clark, Lybrand, Larkin, Fink, Smith, Konasol, Zinn, Knight, Steuffer, Webster, Pauley, and PrimeCare Medical, Inc.*

160.   The preceding paragraphs are incorporated by reference as though laid out fully herein.

161.   Following the assault and choking of Mr. Palmer, Defendants Emig, Cessna, Kopp, Irizarry, Clark, Lybrand, Larkin, Fink, Smith, and Konasol observed Mr. Palmer secured to the emergency restraint chair with a spit hood over his head, his face turned blue, and not breathing.

162. Defendants Emig, Cessna, Kopp, Irizarry, Clark, Lybrand, Larkin, Fink, Smith, and Konasol took no steps to remove the spit hood, begin CPR, or place Mr. Palmer in a recovery position for more than 8 minutes after he stopped breathing.

163. Upon arrival at medical, Defendants Zinn, Knight, Steuffer, Webster, and Pauley observed Plaintiff in the same condition.

164. Defendants Zinn, Knight, Steuffer, Webster, and Pauley likewise took no steps to remove the spit hood, begin CPR, or place Mr. Palmer in a recovery position for more than 4 minutes and thirty seconds.

165. After his arrival in medical, Defendants Emig, Cessna, Kopp, Irizarry, Clark, Lybrand, Larkin, Fink, Smith, Konasol, Zinn, Knight, Steuffer, Webster, and Pauley did not begin administering CPR on Everett for more than fifteen minutes.

166. As a result of the actions of Defendants Emig, Cessna, Kopp, Irizarry, Clark, Lybrand, Larkin, Fink, Smith, Konasol, Zinn, Knight, Steuffer, Webster, and Pauley, Everett Palmer suffered mental anguish, extreme pain and agony, and ultimately death.

167. Defendant PrimeCare is sued in this Count under a *respondeat superior* theory of liability as Defendants Zinn, Knight, Steuffer, Webster, and Pauley were acting within the scope of their employment when they failed to provide Everett Palmer with necessary medical care.

168. To the extent PrimeCare cannot be held liable under a *respondeat superior* theory, PrimeCare is also liable based upon their custom, policy, and practice of failing to provide adequate mental health care to inmates in violation of the Fourteenth Amendment.

**PrimeCare's Pattern of Failing to Provide Emergency Healthcare**

169.   PrimeCare has a long and detailed history of providing substandard health care and providing inadequate emergency care.

170.   In addition to the failures to provide emergency care discussed above, PrimeCare has had a number of other incidents evidencing their continued inability to provide adequate medical care.

171.   October 2011, 25 year old David Campbell died after having been placed in a restraint chair while in obvious physical distress.  PrimeCare failed to provide any emergency medical treatment to Campbell resulting in his death.

172.   On January 5, 2012, 27 year old Travis Magditch died from an asthma attack in his cell after his repeated cries for help went unanswered and PrimeCare failed to provide emergency care.

173.   On February 27, 2013, Alphie Herrera died from being placed in a restraint chair while suffering an epileptic seizure.  PrimeCare employees at the jail failed to provide adequate medical care when they refused to remove him from the chair and render emergency medical treatment.

174.   Despite PrimeCare's consistent failures to provide emergency medical care, they have failed to make any changes to their care policies and training.

175.   These failures were the moving force behind the violation of Everett Palmer's constitutional rights.

176.   Plaintiff seeks survival damages, as stated above, including for the nature and extent of Decedent's injuries, pre-death pain and suffering, emotional distress, and loss of life and enjoyment of life, as well as all available wrongful death damages available under the law.

**WHEREFORE**, Plaintiff demands judgment in her favor, and against Defendants pursuant to 42 U.S.C. § 1983, in an amount in excess of One Million Dollars ($1,000,000.00), including interest, delay damages, costs of suit, general and specific damages, including both survival and wrongful death damages, punitive and exemplary damages as provided by law, attorneys' fees under U.S.C. 1985 and 1988, and any other remedies legally appropriate.

## COUNT VI: PRODUCT LIABILITY
*Plaintiff v. Defendant John Doe Corporation 1*

177.   The preceding paragraphs are incorporated by reference as though laid out fully herein.

178.   John Doe Corporation 1 is the manufacturer of spit hoods used in York County Prison.

179.   John Doe Corporation 1 markets their spit hoods as safe tools for corrections officers to use while restraining detainees.

180.   John Doe Corporation 1 was aware of asphyxiation risk and cardiac issues associated with the use of their spit hoods as a result of recent prior custodial deaths involving spit hoods, including but not limited to:

    i.   May 2009 death of Jonathan Pluck in Cambridgeshire, UK;

    ii.   May 2010 death of Brian Torgerson in Seattle, Washington;

    iii.   September 2010 death of James Perry in Milwaukee, Wisconsin;

    iv.   March 2013 death of Daniel Linsinbigler in Clay County, Florida;

    v.   November 2013 death of Michael David Jones in Davidson County, Tennessee;

     vi.   February 2015 death of Jack Marden in Midland County, Michigan;

     vii.   November 2015 death of Michael Marshall in Denver, Colorado; and,

     viii.   June 2016 death of Corey Rogers in Nova Scotia, Canada.

181.    Nonetheless, John Doe Corporation 1 continued to market and sell their product despite being aware of the known risks of custodial deaths.

182.    The spit hood manufactured and distributed by John Doe Corporation 1 was used on Everett Palmer.

183.    As a result of the assault and defects with the spit hood produced by John Doe Corporation 1, Everett Palmer asphyxiated and died.

184.    Plaintiff seeks survival damages, as stated above, including for the nature and extent of Decedent's injuries, pre-death pain and suffering, emotional distress, and loss of life and enjoyment of life, as well as all available wrongful death damages available under the law.

**WHEREFORE**, Plaintiff demands judgment in her favor, and against Defendants pursuant to state law, in an amount in excess of One Million Dollars ($1,000,000.00), including interest, delay damages, costs of suit, general and specific damages, including both survival and wrongful death damages, punitive and exemplary damages as provided by law, and any other remedies legally appropriate.

### COUNT VII: PRODUCT LIABILITY
*Plaintiff v. Defendant John Doe Corporation 2*

185.    The preceding paragraphs are incorporated by reference as though laid out fully herein.

186.    John Doe Corporation 2 is the manufacturer of emergency restraint chairs used in York County Prison.

187. John Doe Corporation 2 markets their emergency restraint chairs as safe tools for corrections officers to use while restraining detainees.

188. John Doe Corporation 2 was aware of the positional asphyxiation risk associated with the use of their emergency restraint chairs.

189. Nonetheless, John Doe Corporation 2 continued to market and sell their product despite being aware of the known risks of custodial deaths.

190. The emergency restraint chair manufactured and distributed by John Doe Corporation 2 was used on Everett Palmer.

191. As a result of the assault and defects with the emergency restraint chair produced by John Doe Corporation 2, Everett Palmer asphyxiated and died.

192. Plaintiff seeks survival damages, as stated above, including for the nature and extent of Decedent's injuries, pre-death pain and suffering, emotional distress, and loss of life and enjoyment of life, as well as all available wrongful death damages available under the law.

**WHEREFORE**, Plaintiff demands judgment in her favor, and against Defendants pursuant to state law, in an amount in excess of One Million Dollars ($1,000,000.00), including interest, delay damages, costs of suit, general and specific damages, including both survival and wrongful death damages, punitive and exemplary damages as provided by law, and any other remedies legally appropriate.

## COUNT VIII: MUNICIPAL LIABILITY
*Plaintiff v. York County and York County Prison Board*

193. The preceding paragraphs are incorporated by reference as though laid out fully herein.

### Lack of Policies and Training

194.    York County and the York County Prison Board have lack sufficient policies and training relating to:

      i.   Observation and treatment of individuals in isolation;

     ii.   Observation and treatment of individuals exhibiting mental illness;

    iii.   Observation and treatment of individuals placed on suicide watch;

    iv.   Identification and response to mental health crises;

     v.   The use of tasers;

    vi.   The use of restraint chairs;

   vii.   The use of spit hoods;

  viii.   The use of choke holds;

    ix.   Providing medical care to mentally unstable individuals;

     x.   Providing medical care to drugged or intoxicated individuals;

    xi.   Providing medical care to acutely injured individuals

195.    Upon information and belief, York County does not train its prison guards on proper strategies, techniques, their legal responsibilities, or the limits of their legal authority as it relates to the use of force by corrections officers, screening and treatment of mental health issues, confrontations with mentally unstable individuals or obtaining and/or providing acute critical medical care.

196.    As a result of the lack of policies and training by York County, York County prison guards are woefully unequipped to handle these situations and are ignorant of the limits of their lawful authority.

197.   Additionally, due to short staffing during this time period, York County and the York County Prison Board adopted a de facto policy of allowing officers to serve on the CERT team without completing the requisite training program.

198.   This resulted in untrained officers being used on the CERT team for the cell extraction of Everett Palmer and contributed to the use of unprofessional, unnecessary, and deadly force against him.

199.   York County's lack of policies and training were a moving force behind the deprivation of Everett Palmer's constitutional rights.

### Custom of Excessive Force and Inmate Abuse

200.   The unchecked use of violence and excessive force against inmates at York County is widespread.

201.   In 2013, York County Prison Guards Graff, Whitcomb, and Haynes organized what they called the "Retard Olympics."

202.   The prison guards would force inmates to "do stupid stuff for food and coffee."

203.   The guards forced one inmate to drink a gallon of milk in an hour, eat a spoonful of cinnamon, and drink water with pepper foam in it among other degrading tasks.

204.   Being unsatisfied with sophomoric pranks, the guards would force inmates to wrest them or subject them to physical violence.

205.   Guards Graff and Whitcomb beat one inmate about his arms and legs until they went numb.

206.   Prison guard Whitcomb once bribed an inmate with food to permit him to choke out the inmate.

207.  Additionally, the guards arranged a "fight club" in which they would force inmates to fight each other in a storage closet while the guards watched.

208.  In 2016, prison guards viciously assaulted two ICE detainees following a dispute regarding the number of blankets the detainees were allowed to have.

209.  A captain sprayed the detainees with mace while a member of the prison Certified Emergency Response Team (CERT team) physically beat the other detainee in an effort to punish the two detainees.

210.  The beating resulted in one detainee suffering broken dentures from being slammed on a table, as well as knee and elbow injuries.

211.  More than four days passed before he was seen for medical care.

212.  When a grievance was filed, the York County Warden covered up the vicious assault by defending the CERT team for utilizing a "new technique" on the detainee.

213.  In May of 2017, prison guards Cessna, Velasquez, Fitski, and others engaged in a savage beating of inmate Aaron Ornstein.

214.  The guards became annoyed with how slowly Ornstein was moving and kicked his legs causing him to fall.

215.  Once he fell, the guards began kneeing, punching and kicking Ornstein while he was on the ground.

216.  As a result of the beating, Ornstein required stitches to his eye.

217.  Additionally, he suffered a broken clavicle which caused his right lung to fill with 3.5 liters of blood resulting in difficulty breathing.

218. A complaint filed by Ornstein was ignored by Warden Doll, and Ornstein was punished for the incident.

219. Inmate abuse at the York County Prison was not limited to physical violence.

220. There has existed a long history of York County Prison Guards trafficking illegal drugs into the prison.

221. Warden Doll, York County Prison Board, and York County either actively encourage the behavior by overlooking the trafficking or are completely incompetent to stop the known illicit conduct.

222. During 2018, York County Prison Guard Amanda Anderson was actively trafficking heroin and contraband within York County Prison.

223. Anderson was arrested in June of 2018, however this did nothing to slow the trafficking of drugs by prison guards in York County.

224. On January 23, 2020, an inmate at York County Prison was treated for an overdose.

225. York County and Warden Doll attempted to cast aside suspicion of prison guards trafficking drugs and claimed that the inmate had smuggled the drugs in himself, however at the time of the overdose the inmate had been in custody for approximately 49 days.

226. In April of 2020, York County inmate Matthew Hughes was arrested for trafficking narcotics within the York County jail.

227. In June of 2020, York County corrections officer Joshua Martinez was arrested for attempting to traffic narcotics in the York County Prison.

228. The widespread custom of excessive force and inmate abuse was ratified and tolerated by York County and the York County Prison Board.

---

229. This widespread custom and practice was a moving force behind the death of Everett Palmer, Jr.

**WHEREFORE**, Plaintiff demands judgment in her favor, and against Defendants pursuant to 42 U.S.C. § 1983, in an amount in excess of One Million Dollars ($1,000,000.00), including interest, delay damages, costs of suit, general and specific damages, including both survival and wrongful death damages, punitive and exemplary damages as provided by law, attorneys' fees under U.S.C. 1985 and 1988, and any other remedies legally appropriate.

Respectfully submitted,

/s/ John J. Coyle                                    Date: March 15, 2021
John J. Coyle, Esq.

**McELDREW YOUNG**                       **MERRITT LAW**
Daniel N. Purtell, Esquire                  S. Lee Merritt, Esquire
 PA Attorney I.D. No.: 310376              PA Attorney I.D. No.: 314891
John J. Coyle, Esquire
 PA Attorney I.D. No.: 312084

123 S. Broad Street, Suite 2250            123 S. Broad Street, Suite 2250
Philadelphia, PA 19109                     Philadelphia, PA 19109
(215) 545-8800                             (215) 545-8800
jim@mceldrewyoung.com                      lee@leemerrittesq.com
dpurtell@mceldrewyoung.com
jcoyle@mceldrewyoung.com                   *Pro Hac Vice Application Forthcoming*